# 11-4791-cv

## United States Court of Appeals

*for the*

## Second Circuit

———————◆———————

BURTON T. FRIED,

*Plaintiff-Appellant,*

— v. —

LVI SERVICES, INC., AKA LVi SERVICES, INC., LVI PARENT CORP.,
CODE HENNESSY SIMMONS LLC, DBA CHS PRIVATE EQUITY V LP,
APOLLO INVESTMENT CORP., SCOTT E. STATE, in his official capacity and
in his individual capacity, BRIAN SIMMONS, in his official capacity and in his
individual capacity, RAJAY BAGARIA, in his official capacity and in his
individual capacity, GERALD J. GIRARDI, in his official capacity and in his
individual capacity,

*Defendants-Appellees.*

—————————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANTS-APPELLEES

JACKSON LEWIS LLP
*Attorneys for Defendants-Appellees*
666 Third Avenue, 29th Floor
New York, New York 10017
(212) 545-4000

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Defendant-Appellee, LVI Services Inc. ("LVI"), is a privately held corporation organized under the laws of the state of Delaware. Its sole corporate parent is LVI Parent Corporation and no publicly held corporation has an interest of 10% or more in LVI Services Inc.

Defendant-Appellee, LVI Parent Corporation ("LVI Parent") is a privately held corporation organized under the laws of the state of Delaware and has no corporate parent.  Apollo Investment Corp., a publicly held corporation, holds approximately 34% interest in LVI Parent and no other publicly held corporation owns a 10% or more interest in LVI Parent.

# <u>TABLE OF CONTENTS</u>

<u>Page(s)</u>

TABLE OF AUTHORITIES ......................................................................... iii - viii

STATEMENT OF THE ISSUES................................................................1

PRELIMINARY STATEMENT ................................................................2

STATEMENT OF THE FACTS ................................................................4

   I.     BACKGROUND...............................................................4

   II.    THE SALE OF LVI TO CHS .......................................5

   III.   SCOTT STATE'S HIRE AS PRESIDENT AND CEO OF LVI ...............6

   IV.   SCOTT STATE'S TRANSITION TO CEO OF LVI .................8

   V.    OCTOBER 19, 2010 MEETING .................................9

   VI.   THE NOVEMBER 4, 2010 BOARD MEETING......................11

SUMMARY OF ARGUMENT ...............................................................13

ARGUMENT ...........................................................................................14

   I.     STANDARD OF REVIEW .......................................14

   II.    THE COURT PROPERLY CONCLUDED THAT FRIED FAILED TO PROVE THAT HE WAS TERMINATED BECAUSE OF HIS DISCRIMINATION COMPLAINT ...........................................................17

     A.  The Court Used the Proper Standard for Evaluating Fried's Retaliation Claim ...........................................................17

     B.  The Court Meticulously Considered the Undisputed Facts on the Record in Determining that Fried Had Failed to Prove that Defendants' Reasons for His Termination Were Pretextual ...........................................21

   III.   THE COURT PROPERLY DISMISSED FRIED'S ADEA DISCRIMINATION CLAIM .................................................26

i

A.   The Court Used the Proper Standard in Evaluating Fried's
     Discrimination Claim ....................................................................26

B.   The Court Considered All of the Evidence in Finding That Fried
     Failed to Prove That Age Was the "But For" Reason for His
     Termination ..................................................................................30

  1.   The Self-Serving Evidence Presented by Fried Mitigates
       Against a Finding of Age Discrimination ..................................31

  2.   There is Ample Evidence of Fried's Interference ....................32

  3.   The Reassignment of Fried's Job Duties..................................34

  4.   State's Inquiries About Fried's Retirement..............................36

IV.   THE DISTRICT COURT CORRECTLY HELD THAT THE
      NEW YORK CITY HUMAN RIGHTS LAW IS INAPPLICABLE
      TO FRIED'S DISCRIMINATION AND RETALIATION CLAIMS .......43

CONCLUSION ....................................................................................47

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) .....................................48

# TABLE OF AUTHORITIES

**Page(s)**

CASES

Abdu-Brisson v. Delta Air Lines, Inc.,
     239 F.3d 456 (2d Cir. 2001) .........................................................................15, 42

Barton v. Zimmer, Inc.,
     662 F.3d 448 (7th Cir. 2011) ...........................................................16, 17, 18, 19

Bogdan v. N.Y. City Transit Auth.,
     No. 02 Civ. 9587, 2005 U.S. Dist. LEXIS 9317 (S.D.N.Y. May 17, 2005) ......20

Boston v. McFadden Pub., Inc.,
     No. 09 Civ. 457, 2010 WL 3785541 (S.D.N.Y. Sept. 29, 2010).........................39

Boy Scouts of Am. v. Wyman,
     335 F.3d 80 (2d Cir. 2003) .................................................................................15

Brierly v. Deer Park Union Free Sen. Dist.,
     359 F. Supp. 2d 275 (E.D.N.Y. 2005) ................................................................20

Cai v. Wyeth Pharms.,
     09 Civ. 5333 (GBD), 2012 U.S. Dist. LEXIS 38484
     (S.D.N.Y. Mar. 19, 2012) ...................................................................................27

Cardo v. Arlington Cent. Sch. Dist.,
     11-580-CV, 2012 U.S. App. LEXIS 6263 (2d Cir. Mar. 28, 2012) ...................27

Carlton v. Mystic Transp.,
     202 F.3d 129 (2d Cir. 2000) ...............................................................................42

Casper v. Lew Lieberbaum & Co., Inc.,
     No. 97 Civ. 3016, 1998 WL 150993 (S.D.N.Y. Mar. 31, 1998) ........................44

Colon v. Trump Int'l Hotel,
     10 Civ. 4794 (JGK), 2011 U.S. Dist. LEXIS 140606
     (S.D.N.Y. Dec. 6, 2011) .....................................................................................27

Danzer v. Norden Sys.,
     151 F.3d 50 (2d Cir. 1998) .................................................................................42

**Page(s)**

Deebs v. ALSTOM Transp., Inc.,
  550 F. Supp. 2d 385 (W.D.N.Y. 2008)................................................................35

Diaz v. Jiten Hotel Mgmt.,
  762 F. Supp. 2d 319 (D. Mass. 2011).........................................................42, 43

Dister v. The Cont'l Grp., Inc.,
  859 F.2d 1108 (2d Cir. 1988) .............................................................................14

Farina v. Branford Bd. of Educ.,
  09-CV-49 (JCH), 2010 U.S. Dist. LEXIS 99730
  (D. Conn. Sept. 22, 2010) ...........................................................................17, 18

Gallo v. Prudential Residential Servs.,
  22 F.3d 1219 (2d Cir. 1994) ...............................................................................15

Garrett v. Garden City Hotel, Inc.,
  No. 05-CV-0962 (JFB) (AKT), 2007 U.S. Dist. LEXIS 31106
  (E.D.N.Y. April 19, 2007) ..................................................................................31

German v. Cornell Univ.,
  No. 03 Civ 9766(DAB), 2005 WL 2030355 (S.D.N.Y. Aug. 17, 2005)...........44

Getler v. Cornell Weill Univ. Med. Coll. Dept. of Surgery,
  No. 05 Civ. 8550(CLB), 2007 WL 38276 (S.D.N.Y. Jan. 3, 2007)...................39

Giarratano v. Edison Hotel,
  No. 08 Civ. 1849(SAS), 2009 WL 464441 (S.D.N.Y. Feb. 24, 2009)...............41

Gipson v. Wells Fargo N.A.,
  460 F. Supp. 2d 15 (D.D.C. 2006).....................................................................42

Gorzynski v. JetBlue Airways Corp.,
  596 F.3d 93 (2d Cir. 2010) ..........................................................................16, 27

Gross v. FBL Fin. Servs. Inc.,
  557 U.S. 167, 129 S. Ct. 2423 (2009)..........................................................*passim*

Henry v. Wyeth Pharms., Inc.,
  616 F.3d 134 (2d Cir. 2010) ...............................................................................42

**Page(s)**

Hoffman v. Parade Publ'ns,
    15 N.Y.3d 285 (2010) ..................................................................45, 46

Hofmann v. Dist. Council 37,
    No. 99Civ.8636(KMW)(JCF), 2004 WL 1936242
    (S.D.N.Y. Aug. 31, 2004) ..................................................................41

Holowecki v. Federal Express Corp.,
    382 Fed. Appx. 42 (2d Cir. 2010)..............................................16, 27

James v. N.Y. Racing Ass'n,
    233 F.3d 149 (2d Cir. 2000) ...............................................................29

Kirsch v. Fleet Street, Ltd.,
    148 F.3d 149 (2d Cir. 1998) ...............................................................42

Liebowitz v. Cornell Univ.,
    584 F.3d 487 (2d Cir. 2009) ...............................................................26

Lightfoot v. Union Carbide Corp.,
    92 Civ. 6411 (RPP), 1994 U.S. Dist. LEXIS 6191
    (S.D.N.Y. May 12, 1994).................................................................45, 46

Manzer v. Diamond Shamrock Chems. Co.,
    29 F.3d 1078 (6th Cir. 1994) ...............................................................31

Mattera v. JP Morgan Chase Corp.,
    740 F. Supp. 2d 561 (S.D.N.Y. 2010) ................................................18

McDonnell Douglas Corp. v. Green,
    411 U.S. 792 (1973)...............................................................15, 16, 27

Meiri v. Dacon,
    759 F.2d 989, 994 (2d Cir. 1985) ......................................................14

Meloff v. New York Life Ins. Co.,
    51 F.3d 372 (2d Cir. 1995) ................................................................15

Mereish v. Walker,
    359 F.3d 330 (4th Cir. 2004) ..............................................................39

**Page(s)**

Morris v. N.Y.C. Dep't. of Sanitation,
    No. 99 CV 4376(WK), 2003 WL 1739009 (S.D.N.Y. Apr. 2, 2003) ...............41

O'Reilly v. Marina Dodge, Inc.,
    435 Fed. Appx. 8, 2011 U.S. Dist. LEXIS 61521 (2d Cir. 2011) ...............27, 41

Phillips v. Centrix Inc.,
    354 Fed. Appx. 527, 2009 U.S. App. LEXIS 26045 (2d Cir. 2009) .................27

Rasic v. City of Northlake,
    Case No. 08 C 104, 2009 U.S. Dist. LEXIS 88651 (N.D. Ill. Sept. 25,
    2009) ........................................................................................17, 18

Raskin v. Wyatt Co.,
    125 F.3d 55 (2d Cir. 1997) ........................................................39, 40

Reeves v. Sanderson Plumbing Prods., Inc.,
    530 U.S. 133 (2000)...............................................................28, 29, 30

Saenger v. Montefiore Med. Ctr.,
    706 F. Supp. 2d 494 (S.D.N.Y. 2010) .................................................32

Salvatore v. KLM Dutch Airlines,
    No. 98 Civ. 2450, 1999 WL 796172 (S.D.N.Y. Sept. 30, 1999).......................44

Schnabel v. Abramson,
    232 F.3d 83 (2d Cir. 2000) ............................................................29

Schreiber v. Worldco LLC,
    324 F. Supp. 2d 512 (S.D.N.Y. 2004) ............................................41, 42

Sciola v. Quattro Piu, Inc.,
    361 F. Supp. 2d 61 (E.D.N.Y. 2005) ..................................................41

Shapiro v. N.Y.C. Dep't. of Educ.,
    561 F. Supp 2d 413 (S.D.N.Y. 2008) ..............................................41, 42

Shub v. Westchester Cmty. Coll.,
    556 F. Supp. 2d 227 (S.D.N.Y. 2008) .................................................25

**Page(s)**

Spahr v. Am. Dental Ctrs.,
    03 Civ. 4954 (DRH) (ARL), 2006 U.S. Dist. LEXIS 14581
    (E.D.N.Y. Mar. 14, 2006) ................................................................39

St. Mary's Honor Center v. Hicks,
    509 U.S. 502, 113 S. Ct. 2742 (1993) ............................................29

Suttell v. Mfrs. Hanover Trust Co.,
    793 F. Supp. 70 (S.D.N.Y. 1992) ...................................................35

Taylor v. Johnson Controls, Inc.,
    09CV414TSL-FKB, 2011 U.S. Dist. LEXIS 2671
    (S.D. Miss. Jan. 11, 2011) ................................................16, 17, 18

Terry v. Ashcroft,
    336 F.3d 128 (2d Cir. 2003) ...........................................................25

Timbie v. Eli Lilly & Co.,
    429 Fed. Appx. 20, 2011 U.S. App. LEXIS 13486 (2d Cir. 2011) ...................27

Tomassi v. Insignia Fin. Group,
    478 F.3d 111 (2d Cir. 2007) .....................................................32, 42

Velasquez v. Gates,
    No. 08 CV 2215(CLP), 2011 WL 2181625 (E.D.N.Y, June 3, 2011) ...............42

Vesprini v. Shaw Contract Flooring Servs.,
    315 F.3d 37 (1st Cir. 2002) .............................................................39

Zelnik v. Fashion Inst. of Tech.,
    464 F.3d 217 (2d Cir. 2006) ...........................................................14

## OTHER AUTHORITIES

Age Discrimination in Employment Act ..........................................*passim*

Fed. R. App. P. 32(a)(5) .................................................................53

Fed. R. App. P. 32(a)(6) .................................................................53

Fed. R. App. P. 32 (a)(7)(B) ...........................................................53

Fed. R. App. P. 32(a)(7)(B)(iii) ................................................................53

New York City Human Rights Law..............................................*passim*

N.Y.C. Admin. Code § 2-201 .................................................................44

## **STATEMENT OF THE ISSUES**

1.      Did the District Court correctly grant summary judgment dismissing Burton Fried's discrimination claim under the Age Discrimination in Employment Act ("ADEA"), where Defendants have offered a legitimate, nondiscriminatory reason for their actions and Fried has failed to meet his burden of demonstrating that there is a genuine issue of material fact as to whether age is the "but for" reason for his termination?

2.      Did the District Court correctly grant summary judgment dismissing Fried's retaliation claim, where he failed to present any evidence to prove that the reason articulated by Defendants for terminating his employment with LVI and offering him a consultancy agreement was not the true reason, but was pretext for retaliation?

3.      Did the District Court correctly grant summary judgment dismissing Fried's New York City Human Rights Law ("NYCHRL") claims where Fried is a non-resident of New York City and his job duties were primarily performed in LVI's Westport, Connecticut office?

## **PRELIMINARY STATEMENT**

This action arises from Fried's refusal to honor his own offer to make way for the new CEO of LVI.  In September 2010, Fried, the Chairman and interim CEO of Defendant LVI, persuaded Defendant Scott State to take the permanent CEO position by making him an "offer he could not refuse": Fried would "remain at LVI until [State], the Board or I decide it's time for me to leave . . . . [State] will be in charge and get all the room he wants from me."  Less than a month after becoming CEO, State took Fried up on his offer, and asked him to limit his activities on behalf of LVI to those customarily exercised by a Chairman.  In response, Fried cried discrimination, and embarked on a campaign against LVI and its Board that continues to this day.

As set forth below, the District Court, in its lengthy, well-reasoned opinion, found that Fried failed to adduce sufficient evidence that the Board's decision to offer Fried a consulting arrangement in lieu of employment by LVI was motivated by discriminatory animus.  Instead, the District Court found that the undisputed evidence showed that Fried had the abilities to perform a valuable role with LVI, as evidenced by the fact that the very same Board that voted to reduce his role within LVI had only months earlier tapped him to fill the interim CEO role while a permanent candidate was sought.  As the extensive record evidence indicates, it was not his age but, rather, his refusal to relinquish control of the reins of

management to State that prompted Fried's dismissal.  As Fried testified at his deposition: "[T]he CEO role, by its title . . . should have the day-to-day and final decisions in the operations of the business, and the chairman should be a person who supports the actions of the CEO and in any way that the CEO seeks that advice and counsel."  (A-99-100.)  Fried failed to follow his own advice and posed an ultimatum to the Board and to State that he, not they, would determine his role going forward with LVI, creating the rift that led to his termination.

Fried's Appellate Brief ("Appellant's Brief") largely ignores the substantial undisputed evidence in the record and, rather, largely cherry-picks "sound bites" from documents to cobble together the unsubstantiated and unlikely story that Scott State, before even considering accepting the position of CEO, embarked on a nefarious campaign to terminate Fried's relationship with LVI solely because of his age.  This fiction is belied by the record evidence that shows extensive efforts by State and the Board of Directors of LVI Parent to convince Fried to abide by his often-repeated promise that he would step away from his involvement in the day-to-day management of LVI and amply documents Fried's stubborn refusal to allow State to run the company as he saw fit.

Unlike Fried, the District Court examined all of the undisputed evidence on the record and, even giving Fried the benefit of every inference, found that Fried had failed to prove that the Board's ultimate reason for terminating his

3

employment – to ensure that State could run LVI unimpeded – was unworthy of credence and that age was, in fact, the "but for" reason for his termination. The District Court similarly found that Fried failed to prove that the Board's decision to terminate his employment and offer him a consultancy was motivated by his complaint of discrimination. No amount of twisting or torturing of the record can turn a decision to hold a recalcitrant Chairman to the bargain he made into an act solely motivated by ageist animus. The District Court's decision was fully supported by the record and should be upheld by this Court.

## STATEMENT OF THE FACTS

### I.   BACKGROUND

LVI is an environmental remediation company specializing in, among other things, asbestos abatement, demolition, emergency/disaster response such as the response to Hurricane Katrina, and biological and chemical decontamination. (A-30; A-33.) Fried began his employment with LVI in 1986, and subsequently held various positions including General Counsel, President and CEO, interim President and CEO, and Chairman. (A-32.) Although LVI's corporate office is in New York City, for the last seven years prior to his departure from LVI, Fried worked out of a satellite office in Westport, Connecticut that LVI leased exclusively for his personal convenience. (A-32 at ¶27; A-92-94.)

## II.    THE SALE OF LVI TO CHS

In or about November 2005, LVI was purchased by CHS.  As a condition of the sale, and at Fried's insistence, LVI agreed that Fried would be replaced as LVI's President and CEO, and Fried expressed to the Board his wish to relinquish all day-to-day operational responsibilities to the new CEO.  (A-33 at ¶ 30; A-95-96; A-100; A-120.)  This new arrangement was documented in an agreement between Fried and LVI dated November 16, 2005 (the "November Agreement").  Pursuant to the November Agreement, Fried was charged with hiring his replacement as President and CEO.  Thereafter, in his new role as Chairman, Fried would have primary responsibility for "strategic growth," at the direction of the new CEO.  (A-98-100; A-133.)  Significantly, Fried's employment under the November Agreement was at-will, and LVI retained at all times the discretion to alter Fried's duties and responsibilities and to terminate Fried's employment without notice or reason.  (A-101-102; A-133.)

Due in large part to Fried's efforts, in June 2006, LVI hired Robert McNamara as its new President and CEO.  (A-33 at ¶ 32.)  As contemplated by the November Agreement, Fried thereupon resigned from his position as President and CEO and assumed the position of Chairman.  (A-33-34 at ¶¶ 31-32; A-97.)  In addition to his position as Chairman of LVI, Fried retained at all times the position

of Chairman of the Board of Directors of LVI Parent, from which he resigned on November 30, 2010.  (A-246.)

### III.  <u>SCOTT STATE'S HIRE AS PRESIDENT AND CEO OF LVI</u>

In or about April 2010, McNamara abruptly resigned as President and CEO. As a result, the Board of Directors asked Fried, who by then was 70 years old, to accept the position of interim President and CEO until a replacement for McNamara could be found.  (A-35 at ¶ 37; A-103-105.)  As in 2005, Fried insisted on a prompt search for a new President and CEO to assume the day-to-day management of the business.  (A-35 at ¶ 38; A-106.)  LVI retained an executive search firm, Russell Reynolds, to work with Fried to identify qualified candidates for the position.  (A-35 at ¶ 39.)  Fried, who had known State for a number of years, identified him as a candidate for the position and introduced him to LVI and the Board.  (A-33 at ¶ 30; A-107-108.)  State was one of three finalists for the job and ultimately became the choice of Fried and LVI's management.  (A-36 at ¶ 42; A-110-111.)  The Board was equally impressed by State and, upon Fried's recommendation, offered him the position of President and CEO.  (A-36 at ¶ 42; A-109-110.)

The offer to State was made on September 8, 2010 and negotiations thereafter ensued.  As part of these negotiations, and as a condition for accepting the CEO position, State insisted that he be guaranteed the discretion to run the

business as he saw fit.  State had become increasingly suspicious of Fried's representation that he would step away from the management of LVI through his conversations with senior management who maintained that Fried had no intention to retire and planned to continue an active role in LVI's management.  (A-569.)  In an email to Fried dated September 21, 2010, Board member Simmons asked Fried to have a conversation with State to assure him that he would have authority as CEO to align his team and manage the business without Fried's interference.  (A-137.)   Simmons added: "I think it will be very important for him to hear unambiguously from you that he is in charge and you will give him the room he needs." (Id.)  Fried responded to Simmons:  "I will repeat my offer to Scott.  I am prepared to remain at LVI until he, the Board or I decide it's time for me to leave . . . an offer he can't refuse . . . . He will be in charge and get all the room he wants from me." (Id.)  On September 22, Fried again emailed Simmons to tell him that he had spoken with State and that State "now ha[d] no concern about [Fried's] support in his role as CEO."   (A-139.)  With assurances from both the Board and Fried that he could manage the business without interference from Fried, State accepted the offer of employment on September 23, 2010 and assumed the CEO role seven days later on October 1, 2010.  (A-36 at ¶ 43; A-143-144.)

## IV.   SCOTT STATE'S TRANSITION TO CEO OF LVI

State hit the ground running at LVI – meeting and soliciting advice from key LVI management, visiting LVI's many offices, and making the types of decisions he believed necessary to help turnaround what, at that time, was a struggling business.  (A-248-249.)   During this transition period, State began to notice reluctance on Fried's part to relinquish his interim CEO responsibilities, as he had previously assured State he would do.   In addition, State had concerns about Fried's insistence that State confer with him prior to making certain decisions.  (A-148-149.)   State's concerns were heightened after Fried sent State a number of emails criticizing him for failing to consult with Fried on various issues such as the suspension of the search for a Chief Information Officer and a meeting with an overseas client.  (A-172-174; A-175-182.)  Out of frustration, on October 3, 2010, State forwarded one of Fried's acerbic emails to LVI Board member, Robert Hogan, stating that he feared a similar reaction every time he made a decision without consulting Fried – "exactly the issue [he] had prior to accepting the job." (A-184.)  On October 5, 2010, State promised Hogan he would "lay the ground work for an orderly transition" with Fried and that he intended "to have him available as needed for consultation or special assignments."  (A-187.)

On or about October 5, 2010, State and Fried agreed to meet on October 19, 2010 to discuss transition issues, including Fried's future duties as Chairman.  (A-

190.)    On October 14, 2010, Fried sent State an unsolicited email listing responsibilities he purportedly had handled as Chairman under McNamara.  (A-111-112; A-192-193.)  To State's surprise, the expansive list included day-to-day operational responsibilities that State envisioned would be performed by him, such as the development and implementation of new business initiatives, the negotiations of company acquisitions and the management of major client relations.  (A-192-193.)  The list also included responsibilities that State believed could be performed by LVI's General Counsel, Gregory DiCarlo (such as selection of outside counsel and management of LVI litigation and legal matters) and by other members of LVI management and staff (such as review of LVI offers of employment and monitoring of employee air travel).  (Id.; A-150-153.)  State shared the list of responsibilities with members of LVI's Board and sought input on how best to handle Fried's expectations regarding his role, which State considered an issue for the Board to determine.  (A-195-196.)

## V.    OCTOBER 19, 2010 MEETING

On October 19, 2010, State met with Fried to discuss, among other transition items, Fried's proposed responsibilities as LVI Chairman.  (A-37 at ¶ 44; A-111-112.)  At the meeting, State explained that he believed most of the duties on Fried's list would be more appropriately handled by either him or other LVI management and staff members.  (A-37 at ¶ 45; A-113-115; A-156.)  State

explained that the duties and responsibilities of LVI's Chairman should be those traditionally delegated to the role. (A-156-157.) Notwithstanding his prior assurances to State that State "will be in charge and get all the room he wants from me" Fried opposed the restructuring of his role. (A-198.) State reminded Fried of his prior assurances, and as a reminder that transition planning was important, asked Fried: "Burt, you're 71 years of age, how long do you expect to work . . . what if you get hit by a bus, . . . the company has to plan for the future."[1] (A-61-62; A-114-115; A-157-158.) Despite State's overtures, and despite his own prior assurances, Fried refused to discuss any transition of his role.

After the meeting, State, concerned with Fried's refusal to relinquish any of his day-to-day responsibilities at LVI, asked Simmons and other Board members to intervene. (A-198-199.) On October 28, 2010, at Simmons's request, Fried sent him the list of responsibilities prepared for Fried's meeting with State to distribute to the Board. (A-201-202.) On November 2, 2010, Simmons, on behalf of the Board, responded to Fried's list of responsibilities, telling Fried that the list was "much more expansive that what he had envisioned" and "[not] consistent with the sentiments [Fried] had expressed to [him]" when State was hired. (A-37 at ¶ 49; A-204.) Simmons expressed his opinion of the need to transition all of Fried's

---

[1] State testified that this comment echoed a similar statement Fried made to him in a telephone conversation prior to the meeting. (A-154-155.) It is worth noting that age has never been a sensitive subject for Fried until now. Over the years on countless occasions he has made light of his age and the prospect of retirement. (A-208; A-211.) His attributing discriminatory motives to a similarly off-hand comment by State is not credible.

10

day-to-day activities to State and other members of the management team.  (A-204.)  Simmons wrote: "It is my hope that you continue as Chairman of the board in a non-executive capacity and act as on call resource for Scott."  (Id.)  He further proposed that he "replace [Fried's] existing employment arrangement with a consulting agreement."  (Id.)

## VI.    **THE NOVEMBER 4, 2010 BOARD MEETING**

On November 4, 2010, LVI Parent held a regular board meeting to discuss a number of pending business matters.  (A-116.)  At the conclusion of the meeting, the Board went into a closed session and LVI management – except State – left the meeting.  (A-38 at ¶ 51; A-117-118.)  Thereafter, in a 30 minute speech, Fried heatedly objected to any restructuring of his role and complained of State's alleged comment at their October 19, 2010 meeting.  (A-71-75.)  Fried and State were then asked to leave the meeting and the Board discussed how best to resolve the issue, concluding that John Schnabel, a member of the Board and longtime ally of Fried, would contact Fried to resolve what the Board viewed as a political skirmish.  (A-119; A-213; A-221-223.)   Unfortunately, Schnabel was unable to broker an agreement with Fried, leaving the Board no choice but to proceed with the plan outlined in Simmons's November 2, 2010 email.  (A-224-227.)

Pursuant to that plan, the Board proposed that Fried would transition from his role as an employee of LVI to the dual role of non-executive Chairman of the

Board of LVI Parent and of consultant. (A-232.) Under the proposal, Fried's employment as Chairman of LVI would end, and he would be formally offered a consulting agreement pursuant to which he would be paid an annual retainer of $150,000, plus $250 per hour for time spent in his consulting role. (A-232.) This amount was intended to compensate Fried at the same level as he was previously compensated as an LVI employee. (A-228-229.) Fried's initial assignment would include overseeing several litigation matters. (A-232.)

On November 15, 2010, however, before the Board could make its formal offer of a consulting agreement to Fried, Fried sent a letter through his attorney to State threatening to sue LVI and demanding, among other things, that he be reinstated with his former responsibilities. (A-238-243.) State, who was traveling at the time, did not receive the letter until November 16, 2010. On November 16, 2010, the Board sent the consultancy agreement to Fried. (A-159-162.) Fried rejected LVI's offer and resigned his position on the Board effective November 30, 2010. (A-246.) LVI, as planned, terminated Fried's employment with LVI on November 30, 2010, but continued to offer Fried the consultancy arrangement through counsel. (A-19 at ¶ 3.) Fried rejected LVI's offer. (A-19-20 at ¶ 4.)

## **SUMMARY OF ARGUMENT**

On appeal, Fried fails to provide any valid reason to overturn the District Court's decision granting Defendants' Motion for Summary Judgment. The District Court, using the pre-<u>Gross</u> burden-shifting standard found that Fried failed to raise an issue of fact that Defendants' reasons for terminating Fried's employment and offering, in its stead, a consultant agreement, were pretext for retaliation. Other than the temporal proximity between his complaint of age discrimination and the termination of his employment, Fried has failed to set forth evidence that Defendants' articulated reason for his termination – to ensure that State could run LVI as he saw fit – was false. In fact, the undisputed evidence manifests that the decision to terminate Fried's employment and offer him a consultancy was considered and communicated to Fried before LVI's receipt of Fried's demand letter threatening a lawsuit and that, instead of retaliating against Fried because of the letter, the Board chose to ignore it and proceed with the plan to offer him the consultancy.

Similarly, Fried failed to meet his burden of showing that age was the "but for" reason for his termination, as required under <u>Gross v. FBL Fin. Servs. Inc.,</u> 557 U.S. 167, 176, 129 S. Ct. 2423, 2350 (2009). The District Court correctly found that State's purported comment requesting clarification on the timing of his retirement was not enough, under the law, to meet Fried's burden of raising

sufficient evidence from which a reasonable jury could conclude by a preponderance of the evidence that age was the "but for" cause of his termination. In making this determination, the District Court carefully considered all of the record evidence and, placing State's comment in its proper context, found that Fried was terminated because of conflicting visions over his role as Chairman of LVI, and not because of his age.

Finally, the District Court was correct in applying the prevailing law in this Circuit and finding that Fried could not avail himself of the protections of the NYCHRL because he both resided and worked in Connecticut at all times relevant to his claims.

## **ARGUMENT**

### I.  **STANDARD OF REVIEW**

The grant of summary judgment is subject to <u>de novo</u> review by this Court, and may therefore be affirmed upon any grounds supported in the record.  <u>Zelnik v. Fashion Inst. of Tech.</u>, 464 F.3d 217, 224 (2d Cir. 2006).  In the context of discrimination actions, this Court has held that "the salutary purposes of summary judgment – avoiding protracted, expensive and harassing trials – apply no less to discrimination cases than to commercial or other areas of litigation."  <u>Dister v. The Cont'l Grp., Inc.</u>, 859 F.2d 1108, 1114 (2d Cir. 1988), <u>quoting</u> <u>Meiri v. Dacon</u>, 759 F.2d 989, 994 (2d Cir. 1985), <u>cert. denied</u>, 474 U.S. 829 (1985).

Summary judgment is appropriate where, viewing the evidence in the light most favorable to the opposing party, there is no genuine issue of material fact. Boy Scouts of Am. v. Wyman, 335 F.3d 80, 88 (2d Cir. 2003). While a case in which the issue turns on the intent of one party requires that a trial court be cautious about granting summary judgment, Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223 (2d Cir. 1994), when an employer provides convincing evidence to explain its conduct and the plaintiff's argument consists of purely conclusory allegations of discrimination, the court may conclude that no material issues of fact exist and it may grant summary judgment to the employer. See Meloff v. New York Life Ins. Co., 51 F.3d 372, 375 (2d Cir. 1995). As this Court has stated, "[i]t is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases." Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001).

In Gross, the Supreme Court held that "the ordinary meaning of the ADEA's requirement that an employer took adverse action 'because of' age is that age was the 'reason' that the employer decided to act." 557 U.S. at 168, 129 S. Ct. at 2345. Thus, "[t]o establish a disparate-treatment claim under the plain language of the ADEA, . . . a plaintiff must prove that age was the 'but for' cause of the employer's adverse action." Id. Although the Supreme Court noted that it "has not definitively decided whether the evidentiary framework of [McDonnell

15

Douglas] . . . is appropriate in the ADEA context," id. at 175 n.2, 129 S. Ct. at 2349 n.2, New York courts have continued to apply a modified version of the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973), to cases brought under the ADEA.  See Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 106 (2d Cir. 2010).  Specifically, a plaintiff bringing a case under the ADEA must first establish a *prima facie* claim of discrimination by showing that: (1) he was within the protected age group; (2) he was qualified for the position; (3) he experienced an adverse action; and (4) the adverse action occurred under circumstances giving rise to an inference of employment discrimination.  Id. at 107.  If the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to "articulate some legitimate nondiscriminatory reason for [the adverse act]."  Id. at 106, citing McDonnell Douglas Corp., 411 U.S. at 802.  After the defendant satisfies the requirement, the burden then shifts to the plaintiff to demonstrate that age was the "but for" cause of the challenged adverse employment action.  Id. at 106; Holowecki v. Federal Express Corp., 382 Fed. Appx. 42, 45 (2d Cir. 2010).

Although the Second Circuit has not spoken, as yet, as to whether Gross's "but for" causation standard applies to cases of retaliation brought under the ADEA, courts that have considered the issue have overwhelmingly held that it does.  See, e.g., Barton v. Zimmer, Inc., 662 F.3d 448 (7th Cir. 2011); Taylor v.

Johnson Controls, Inc., 09CV414TSL-FKB, 2011 U.S. Dist. LEXIS 2671, at *8
(S.D. Miss. Jan. 11, 2011); Farina v. Branford Bd. of Educ., 09-CV-49 (JCH),
2010 U.S. Dist. LEXIS 99730, at *27 (D. Conn. Sept. 22, 2010), aff'd, 2011 U.S.
App. LEXIS 23169 (2d Cir. Nov. 18, 2011); Rasic v. City of Northlake, Case No.
08 C 104, 2009 U.S. Dist. LEXIS 88651, at *55 (N.D. Ill. Sept. 25, 2009).

## II.   THE COURT PROPERLY CONCLUDED THAT FRIED FAILED TO PROVE THAT HE WAS TERMINATED BECAUSE OF HIS DISCRIMINATION COMPLAINT

In his Brief, Fried maintains that the District Court incorrectly applied
Gross's "but for" standard to Fried's ADEA retaliation claim and failed to consider
a Board member's testimony and notes relating to the offer of a consultancy to
Fried.  (Appellant's Brief at 19.)  Contrary to Fried's contention, the District Court
was careful not only to clearly set forth the accurate standard for evaluating claims
of retaliation under the post-Gross ADEA construct, but also to consider (and
ultimately reject) Fried's inconclusive and unsupported evidence of retaliation.

### A.   The Court Used the Proper Standard for Evaluating Fried's Retaliation Claim

Fried correctly states that the Supreme Court did not address whether the
"but for" standard applied to Gross's age discrimination claim would be similarly
applicable to retaliation claims under the ADEA and that this Circuit has not
definitively spoken on the issue.  (Appellant's Brief at 21.)  However, the majority
of courts who have addressed the issue, as recognized by the case cited by Fried,

Mattera v. JP Morgan Chase Corp., overwhelmingly have held that, as the same "because of" language is found in both the discrimination and retaliation provisions of the ADEA, the "but for" construct announced by Gross should apply to both.  See Mattera, 740 F. Supp. 2d 561, 578 n. 13 (S.D.N.Y. 2010) (citing cases).

In Gross, the Court found that, as a matter of textual analysis, the "because of" language of the discrimination provision of the ADEA requires a plaintiff to prove that "age was the 'but for' cause of the employer's adverse decision." Gross, 557 U.S. at 176, 129 S. Ct. at 2350.  The Court then held that since Congress amended both Title VII and the ADEA in 1991 and did not change the "because of" language of the ADEA discrimination provision, while changing the discrimination provision of Title VII, it intended to retain the higher "but for" burden for claims brought under the ADEA.  Id. at 167-168, 129 S. Ct. at 2345.  As the retaliation provision of the ADEA contains the same "because of" language as the discrimination provision, also unchanged by Congress in 1991, the majority of courts that have considered the issue have held that the "but for" standard announced in Gross applies to both the discrimination and the retaliation provisions of the statute.  See Barton v. Zimmer, Inc., 662 F.3d 448 (7th Cir. 2011).  See also Taylor, 2011 U.S. Dist. LEXIS 2671, at *8; Farina, 2010 U.S. Dist. LEXIS 99730, at *27; Rasic, 2009 U.S. Dist. LEXIS 88651, at *55.

18

In <u>Barton</u>, as an example, the court applied the "but for" standard to the plaintiff's ADEA retaliation claim, reasoning that, as the ADEA's anti-retaliation provision employs similar language as the discrimination provision, prohibiting retaliation "because" an employee exercises protected rights, the ADEA's "but for" causation should apply both to discrimination and retaliation claims. <u>Barton</u>, 662 F.3d at 455-56 & n. 3. If the District Court had used the "but for" causation in evaluating Fried's ADEA retaliation claim (which, as set forth below, it did not), it would have evaluated the claim in accordance with both the logical interpretation of <u>Gross</u> and the current weight of federal case law.

Contrary to Fried's contention, however, instead of ignoring the proper post-<u>Gross</u> standard, the Court took pains to carefully consider the pre-<u>Gross</u> evidentiary burden-shifting framework in evaluating Fried's retaliation claim. Drawing all reasonable inferences in favor of Fried, the Court concluded that Fried had set forth a <u>prima facie</u> claim of retaliation. (SPA-31.) The Court then moved on to the remaining proof burdens and concluded that Fried had been unsuccessful in proving that Defendants' reasons for terminating his employment and offering him a consultancy – to ensure that the new CEO and President would have the freedom to manage the company as he saw fit – was pretextual. (SPA-31.) The District Court did not apply <u>Gross</u>'s "but for" standard, as Fried claims, but, rather, described Fried's final burden as requiring him to demonstrate that Defendants'

19

legitimate reason for the adverse employment action was pretextual.  (SPA-31.)
Relying on its thorough analysis of the termination decision in the context of the
discrimination claim, the District Court justly found that Fried had failed to set
forth evidence that Defendants' decision to terminate his employment and offer
him a consultancy was pretext for retaliation.  (Id.)  Fried's claim that the District
Court applied the wrong standard in evaluating his retaliation claim finds no basis
in the District Court's opinion.

As with a claim of discrimination, to establish pretext by circumstantial
evidence (as Fried must) an employee must show: "such weakness,
implausibilities, inconsistencies, incoherencies, or contradiction in the employer's
proffered legitimate reason for its action that a reasonable fact finder could find the
reason unworthy of credence."  Bogdan v. N.Y. City Transit Auth., No. 02 Civ.
9587, 2005 U.S. Dist. LEXIS 9317, at *25 (S.D.N.Y. May 17, 2005) (quoting
Brierly v. Deer Park Union Free Sen. Dist., 359 F. Supp. 2d 275, 291 (E.D.N.Y.
2005).  The District Court correctly found that there was no evidence of such
deficiencies in Defendants' explanation for their decision to terminate Fried's
employment.  Although Fried may disagree with the outcome of the Board's
decision, he presented no evidence that would lead a rational person to believe that
the decision was pretext for retaliation.

**B.**    **The Court Meticulously Considered the Undisputed Facts on the Record in Determining that Fried Had Failed to Prove that Defendants' Reasons for His Termination Were Pretextual**

After mischaracterizing the Court's analysis of his retaliation claim, Fried next falsely accuses the Court of not having considered the "material issues of fact" as to whether Fried's complaint of discrimination was a motivating factor in the decision to fire him.  Specifically, Fried accuses the District Court of having "completely failed to grasp" a purported admission by Board member Gerald Girardi.  (Appellant's Brief at 19.)

As is patently clear from the Opinion, the District Court devoted twenty pages to the careful examination of the material facts leading up to Board's decision to offer Fried a consultancy on November 30, 2010.  It is undisputed that both the Board and State had decided, with Fried's blessing, to remove him from the day-to-day running of the company even before State accepted the position as CEO in September 2010.  This agreement was a condition of State's acceptance, as manifested by the direct communications between State, the Board and Fried, contained in the record. On September 14, 2010, State, as part of his due diligence in accepting LVI's offer, obtained details as to the requirements for transition of Fried from the position of Chairman of the Board of LVI Parent and explained both his concern and his intentions to Hogan in an email dated September 19, 2010:

> I would like Burt's commitment not to challenge those decisions if they are made as this would likely result in an immediate division of the management team.
>
> In the best-case scenario Burt will decide to retire at some date certain from LVI upon a new CEO being named and offer to support the business under a consulting agreement in any way the new CEO sees fit. Several members of the senior team have told me that Burt will never retire because he has no other interests and nothing else to do. This is not a healthy situation for Burt or LVI.

(A-569.) So concerned was State with Fried's possible future interference with his mandate to run LVI as he saw fit, that he insisted, as a condition of his hire, on receiving reaffirmation from Fried that he intended to step away from the management of LVI. In an email to Hogan, in preparation for his discussion with State regarding Fried's transition away from the management of LVI, Fried stated:

> I will repeat my offer to Scott. I am prepared to remain at LVI until he, the Board or I decide it is time for me to leave . . . an offer he can't refuse. Ask you to recall that one of the purposes of my working in Westport was to get out of the way of the new CEO at the NY Corporate office.
>
> Trust you have no problem with my planned reply . . . He will be in charge and get all the room he wants from me.

(A-137.)

It was, therefore, expressly stated well before the meeting of October 19, 2010 that State and the Board (and seemingly Fried as well) had decided that Fried would relinquish the reins of management and assume an advisory position serving at the pleasure of State and the Board. Fried's baseless and unsupported

contention that the Board never contemplated firing him until the complaint of age discrimination is simply semantic wordplay.  As consistently set forth in the record, the Board had all intention that Fried resign from his active involvement in the day-to-day management of LVI – an intention that they thought Fried supported, even before State was hired and months before the meeting of October 19, 2010.

Fried's purportedly pivotal piece of evidence that Defendants retaliated against him is Gerald Girardi's testimony and notes taken during a telephone call with the Board on November 16, 2010.  (Appellant's Brief at 23.)  Girardi's testimony and notes, in fact, indicate only that, despite the receipt of Fried's counsel's letter of November 15, 2010, the Board was prepared to move forward with presenting the offer of consultancy to Fried, as had been planned well before the arrival of the letter.  Girardi's very words "ignore pre-emptive letter" are clear evidence that the Board was willing to overlook Fried's attorney's combative missive and move forward with a plan that would have allowed him to continue to play a role at LVI.  Girardi testified:

> Q.  Okay. And why did you – why did the board ignore the letter?
>
> A.  We wanted to keep Burt on – Burt on as a chairman, and so we sent him an offer to enter into a consultancy agreement I believe shortly after this call.

(A-419 at p. 90.)

The offer of a consultancy, contemplated even before State's hire and communicated to Fried by Simmons on November 2, 2010, was circulated for the Board's comment at least by November 11, 2010, four days before the receipt of Fried's counsel's letter.  (A-703.)  Rather than it solely containing the terms of Fried's termination, Simmons's letter explained Fried's role going forward, that he would continue in his role of Chairman of the Board of Directors of LVI Parent and continue his relationship with LVI Services on a consultant basis, with his first assignment to be his continued support on a number of ongoing litigations.  (A-604.)  For his work as a consultant, Fried was offered an annual retainer of $150,000 plus an hourly rate of $250.00 for time spent working on LVI's behalf. (A-604.)  Simmons testified that this pay structure was intended to keep Fried at approximately the same level of compensation that he had as Chairman of LVI. (A-228-229.)  Considering Girardi's notes in the context of the undisputed facts, there is no other rational way to interpret Girardi's phrase "Burt - sent pre-emptive letter. *Ignore* and send good faith letter offer to Burt Fried" other than on its face value, that the Board would ignore Fried's litigious overture and move forward with the offer of consultancy that had been contemplated and communicated to Fried before the arrival of the demand letter.  The District Court accorded the notes their rational meaning and discounted them as evidence of retaliation.

24

In the cases cited by Fried in his Brief, unlike the case here, the plaintiffs produced direct evidence that their complaints of discrimination were the cause of the defendants' adverse actions. In <u>Shub v. Westchester Cmty. Coll.</u>, 556 F. Supp. 2d 227 (S.D.N.Y. 2008), <u>recons. denied</u>, 06 Civ. 8324 (WCC), 2008 U.S. Dist. LEXIS 35662 (S.D.N.Y. Apr. 22, 2008), the decision maker, during his deposition, was directly asked why he decided not to hire the plaintiff for a teaching position. He responded "Well, we had a suit pending against us and I just didn't know how to proceed after that." <u>Id.</u> at 257. When asked if there was any other reason, he replied: "Not that I recall." <u>Id.</u> Similarly, in <u>Terry v. Ashcroft</u>, 336 F.3d 128 (2d Cir. 2003) the plaintiff presented testimony about other employees who had faced retaliation when they complained about unlawful discrimination and taped statements from the plaintiff's supervisor that he was concerned about retaliation if he testified on the plaintiff's behalf. <u>Id.</u> at 141. In addition, the plaintiff produced a memorandum listing candidates for promotion with the notations "Pending Complaint" next to his name and "EEO Activity" next to the name of another employee. <u>Id.</u> Unlike Girardi's testimony and notes, the unambiguous comments made by the defendants in <u>Shub</u> and <u>Terry</u> could only be interpreted as evidence that the plaintiffs were subjected to adverse actions because of their complaints. There is no such evidence here.

As the Court below soundly determined, Fried's support for his retaliation claim boils down to the temporal proximity between his complaint and Simmons's proposal of November 16, 2010, which terminated his role as an LVI employee and offered him, instead, a consultancy agreement.  In addition to the insufficiency of this temporal proximity alone to defeat Defendants' motion for summary judgment, the proximity is totally undermined by the fact that the decision to ask Fried to assume a consultant role was considered by State and the members of the Board even before State accepted the position of CEO and President.  (A-568-569.)

## III.    THE COURT PROPERLY DISMISSED FRIED'S ADEA DISCRIMINATION CLAIM

### A.    The Court Used the Proper Standard in Evaluating Fried's Discrimination Claim

In setting forth the burden-shifting framework used to analyze ADEA cases post-<u>Gross</u>, Fried blatantly misstates the third prong of the framework that sets out the plaintiff's burden after the defendant has set forth a legitimate nondiscriminatory reason for the adverse act.  Fried states "the burden shifts to Mr. Fried to raise a triable issue of material fact as to whether Defendants' proffered reason for the adverse action was a mere pretext for unlawful discrimination." (Appellant's Brief at 27, citing the pre-<u>Gross</u> decision, <u>Liebowitz v. Cornell Univ.</u>, 584 F.3d 487, 499 (2d Cir. 2009).)  Fried then attempts to justify his misstatement in a footnote, explaining that, as <u>Gross</u> was decided in the context of a trial, its "but

for" standard does not apply in the context of summary judgment. (Appellant's Brief at 27, n. 1.) As support for this unfounded proposition, Fried cites a single non-binding case out of the United States Court of Appeals for the Ninth Circuit. Id.

Fried's disingenuous proffer is directly contradicted not only by the prevailing law in this Circuit, but by his own opposition to the summary judgment brief filed before the District Court. The standard this Circuit has consistently used in evaluating post-Gross ADEA cases in the summary judgment context is that, in order for the plaintiff to satisfy his burden in the final stage of the McDonnell Douglas analysis, the plaintiff must "offer evidence that age discrimination was the "but for" cause of the challenged actions." Gorzynski, 596 F.3d at 107. See also, Cardo v. Arlington Cent. Sch. Dist., 11-580-CV, 2012 U.S. App. LEXIS 6263, at *3 (2d Cir. Mar. 28, 2012); Timbie v. Eli Lilly & Co., 429 Fed. Appx. 20, 10-3130-CV, 2011 U.S. App. LEXIS 13486, at *4 (2d Cir. 2011); O'Reilly v. Marina Dodge, Inc., 435 Fed. Appx. 8, 10-2471-CV, 2011 U.S. Dist. LEXIS 61521 (2d Cir. 2011); Holowecki, 382 Fed. Appx. at 45; Phillips v. Centrix Inc., 354 Fed. Appx. 527, 2009 U.S. App. LEXIS 26045, at *2 (2d Cir. 2009); Cai v. Wyeth Pharms., 09 Civ. 5333 (GBD), 2012 U.S. Dist. LEXIS 38484, at *17 (S.D.N.Y. Mar. 19, 2012); Colon v. Trump Int'l Hotel, 10 Civ. 4794 (JGK), 2011 U.S. Dist. LEXIS 140606, at *12 (S.D.N.Y. Dec. 6, 2011).

Not only has this standard been overwhelmingly adopted by this Circuit, but Fried expressly used this standard in his Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment (the "Opp. MOL").  Citing <u>Gross</u>, Fried stated: "Now, the burden shifts back to Mr. Fried to establish that his age was the but for cause of the employer's adverse action."  (Opp. MOL at 12.)  Similarly, in its Amicus Brief, the EEOC correctly states: "The Supreme Court clarified in Gross that, in the ADEA context, this means that in order to establish liability '[a] plaintiff must prove by a preponderance of the evidence (which may be direct or circumstantial) that age was the 'but for' cause of the challenged decision.'" (EEOC Brief at 20) (citations omitted). As such, Fried's baseless and unsupported contention that the District Court applied the wrong standard in evaluating Fried's discrimination claim should be discounted.

Although the EEOC cites the correct standard for the evaluation of the last prong in a post-<u>Gross</u> age discrimination case (EEOC Brief at 20), it takes issue with the District Court's statement of the last prong of the retaliation proof burden under <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 120 S. Ct. 2097 (2000).  (EEOC Brief at 29-34.)  The EEOC has read <u>Reeves</u> too narrowly.  In <u>Reeves</u>, a pre-<u>Gross</u> ADEA retaliation claim, the Supreme Court clarified that, once the employer sets forth a legitimate non-discriminatory reason for its decision, the plaintiff "must be afforded the opportunity to prove by a

preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Id. at 143 (citations omitted). The Court explained:

> The ultimate question is whether the employer intentionally discriminated, and proof that "the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason . . . is correct." In other words, "it is not enough . . . to *dis*believe the employer; the fact finder must *believe* the plaintiff's explanation of intentional discrimination."

Id. at 146-47 (quoting St. Mary's Honor Center v. Hicks, 509 U.S. 502, 519 & 524, 113 S. Ct. 2742, 2756 & 2762 (1993)).

In short, Reeves simply stands for the proposition that a prima facie claim plus sufficient evidence to reject the employer's explanation "*may* permit a finding of liability." Reeves, 530 U.S. at 149, 120 S. Ct. at 2109. See also James v. N.Y. Racing Ass'n, 233 F.3d 149, 155 (2d Cir. 2000) (reasoning that Reeves held that "a prima facie case prior to the employer's proffer of a reason, coupled with the error or falsity of the employer's proffered reason may – *or may not* – be sufficient to show illegal discrimination.") (emphasis added) (citations omitted); Schnabel v. Abramson, 232 F.3d 83, 90 (2d Cir. 2000) (holding that "Reeves clearly mandates a case-by-case approach, with a court examining the entire record to determine whether the plaintiff could satisfy his 'ultimate burden of persuading the trier of

29

fact that the defendant intentionally discriminated against the plaintiff'") (quoting Reeves, 530 U.S. at 142, 120 S. Ct. 2105).

Even assuming, without conceding, that the Reeves burden-shifting standard is still applicable after Gross, the District Court, in fact, was careful to apply the Reeves standard in finding that Fried had failed to demonstrate that Defendants' proffered reason was false and that the real reason for his termination was unlawful discrimination. (SPA-23.) The District Court found: "[T]he undisputed evidence in the record, which has been recounted at length above, amply supports defendants' contention that Fried was fired because of conflicting visions concerning the proper role of LVI's chairman." (Id.) As such, both Fried's and the EEOC's contentions that the District Court erred in applying the prevailing standards for evaluating discrimination claims under the ADEA should be discounted.

**B.** **The Court Considered All of the Evidence in Finding That Fried Failed to Prove That Age Was the "But For" Reason for His Termination**

In addition to attempting to confuse the well-established standard for evaluating discrimination cases under the ADEA in the wake of Gross, Fried inaccurately minimizes the Court's thorough twenty-page analysis of the material facts as "advocacy to justify its decision." In fact, the Court conducted a detailed factual analysis of the evidence viewed in a light most favorable to Fried before

finding that Fried had failed to prove that Defendants' reason for his termination –
to ensure that the new CEO, Scott State, could run the Company as he saw fit –
was pretextual and that age was the "but-for" reason for Fried's termination.

### 1.    The Self-Serving Evidence Presented by Fried Mitigates Against a Finding of Age Discrimination

In an attempt to blur the undisputed record evidence substantiating Fried's
dramatic turn-about with respect to his agreement to surrender control of LVI's
management to State, Fried attempts to reinterpret that evidence to suit his needs.
Fried's first category of evidence consists of a number of self-serving statements
that support his contention that he did a good job as Chairman under McNamara
and as interim CEO.  These laudatory statements are not disputed by Defendants
because they actually support Defendants' legitimate non-discriminatory reason for
his termination – that Fried was, in fact, viewed by the Board not as a declining old
man, but as a formidable roadblock to State's mandate to lead LVI.

Initially, Fried's performance has never been cited as a reason for his
termination.  As such, his good performance as the CEO of LVI and as the
Chairman under McNamara is of no consequence.  Indeed, the mere fact that an
employee receives positive reviews prior to discharge is not evidence of pretext.
See Garrett v. Garden City Hotel, Inc., No. 05-CV-0962 (JFB) (AKT), 2007 U.S.
Dist. LEXIS 31106, at *45-46 (E.D.N.Y. April 19, 2007); see also Manzer v.
Diamond Shamrock Chems. Co., 29 F.3d 1078, 1084-1085 (6th Cir. 1994).

Second, the fact that Fried was asked to assume the interim post of President and CEO at the age of 70, upon McNamara's departure, and that he received praise from the Board in that role is a clear indication that the Board did not view him as incapacitated because of his age. "[I]t is the very essence of age discrimination for an older employee to be fired because the employer believes that productivity and competence decline with old age . . . . [T]he ADEA was prompted by [the] concern that older workers were being deprived of employment on the basis of inaccurate and stigmatizing stereotypes." Saenger v. Montefiore Med. Ctr., 706 F. Supp. 2d 494, 510 (S.D.N.Y. 2010) (citation omitted). See also Tomassi v. Insignia Fin. Group, 478 F.3d 111, 116 (2d Cir. 2007) ("[t]he relevance of discrimination-related remarks does not depend on their offensiveness but rather on their tendency to show that the decision-maker was motivated by assumptions and attitudes relating to the protected class"). Fried's evidence underscores the fact that Defendants knew that he had the ability to perform a valuable role for LVI and that, ultimately, it was not his age, but, rather his refusal to relinquish control of the reins of management to State that prompted his dismissal.

## 2.    There is Ample Evidence of Fried's Interference

Fried's second attempt at proving pretext is the blatantly false statement that "Defendants do not even allege that Mr. Fried actually interfered with State." (Appellant's Brief at 32.) Contrary to Fried's unfounded contention, the record is

replete with undisputed evidence that Fried began a campaign of interference from State's earliest days at LVI.[2]  Specifically, during the transition period, Fried repeatedly demanded that State confer with him prior to making decisions, leading State to protest to the Board that this was "exactly the issue I had prior to accepting the job." (A-184.)  Shortly after State's hire, on October 3, 2010, Fried fired off an email objecting to State's decision to suspend the search for a CIO.  (A-173.) Fried wrote: "Believe it appropriate that you receive my views on all CEO transitional issues including a HR and CIO position before you reach a decision to suspend recruitment efforts that I initiated."  (A-173.)  Ten days later, on October 13, 2010, Fried took issue with State's decision to reconsider a trip to London for a potential business opportunity.  Fried admonished: "To refuse my advice, knowledge and input as architect of this relationship . . . and to terminate my continued involvement with Squibb will undermine the LVI/Squibb relationship that has been developing between Les and me…….very sensitive since the damage caused by Bob McNamara." (A-176.)  Critically, Fried communicated his intent to continue to involve himself with LVI's management by presenting State with a list of responsibilities he proposed to perform, ranging from the development and implementation of business initiatives to tasks as mundane as the monitoring of all

---

[2] The EEOC, in its brief, concedes to the existence of evidence that, in the early weeks of State's employment, "emails in the record reflect that State and Fried disagreed over Fried's continuing role at LVI, with Fried expressing the belief that his input should be sought on various issues and State insisting to Fried and other Board members that Fried's input was unnecessary.  (EEOC Brief at 8.)

employee air travel. (A-193.) State's email to Simmons and Hogan, dated October 14, 2010, forwarding the list of responsibilities sent by Fried, fully explains the reasons that ultimately led to the decision to terminate Fried's employment with LVI:

> I have been going back and forth with Burt on who does what at LVI. He has been pretty unhappy that I do not seek his counsel on almost everything and has expressed that view to me and a number of other members of the senior management, all of whom seem to be looking for new leadership and a new direction. . . .
>
> . . . .
>
> . . . . Here is my dilemma, after review of this list there is really only one bullet that pertains to the discussion I had with him 10 minutes earlier yet he somehow believes his view of his duties is consistent with my view. I can't be more clear than I have been and I don't see spending $1MM/yr to have Burt reviewing air travel and BS administrative items.

(A-195.) It was precisely Fried's blind refusal to accept a role as envisioned by the new CEO and Board that led to the decision to terminate his employment with LVI and to offer him a consultancy. Defendants, therefore, have set forth sufficient evidence of Fried's interference with State's management of LVI, in contravention of the promises he repeatedly made to Defendants, to support the Board's reason for deciding to offer him a consultancy.

### 3. The Reassignment of Fried's Job Duties

Fried also maintains that the reassignment of his job duties to employees that ranged from 13 to 35 years younger than him is evidence of age discrimination.

(Appellant's Brief at 29.)   Initially, with the exception of one manager, the job duties on the list proposed to State by Fried were ultimately assumed by individuals over the age of 40, including State, who was 47 at the time.[3] Moreover, the reassignment of a terminated employee's duties to younger employees is not itself indicative of age discrimination.  See Deebs v. ALSTOM Transp., Inc., 550 F. Supp. 2d 385, 390-91 (W.D.N.Y. 2008) ("reassignment of [the plaintiff's duties] to other, younger employees does not dictate a finding that other employees were hired into the [plaintiff's] position, or that the position was effectively reinstated at any relevant time following [the plaintiff's] discharge") aff'd, 346 Fed. Appx. 654 (2d Cir. 2009); Suttell v. Mfrs. Hanover Trust Co., 793 F. Supp. 70, 73 (S.D.N.Y. 1992) (reassigning the plaintiff's duties to younger employees after his job was eliminated did not mean that the plaintiff was "replaced" by a younger employee for the purposes of his age discrimination claim).  LVI did not replace Fried's Chairman position and the unsurprising fact that the duties Fried purportedly performed under McNamara were ultimately transitioned to other LVI managers, most of whom were in the ADEA protected age category, is not indicative of age discrimination.

---

[3] As the Court noted, Fried's duties were mostly reassigned to Tom Cullen, age 35; Gregory DiCarlo, age 44; David Pearson, age 44; Frank Aiello, age 45; John Leonard, age 46; State, age 47; Mark Canessa, age 48; Kamal Sookram, age 53 and Joseph Annarumma, age 57.  (SPA-18; Appellant's Brief at 12-13.)

### 4. State's Inquiries About Fried's Retirement

Fried's next silo of "evidence" consists of email communications from State asking for assurance that Fried was willing and able to step away, or retire, from the management of LVI and assume an advisory role at the will of the CEO. Rather than ignoring these statements, the District Court did an admirable job of putting these statements into a rational context based on the undisputed record evidence. Based on the record facts, the District Court concluded that State's inquiries about Fried's future retirement, including his comment in the October 19, 2010 meeting, were "stray comments" because, rather than evidencing animosity toward age, they were reasonable inquiries into Fried's intent to release the reins of management to State.

Fried's agreement to step down, or effectively retire, from his interim leadership position as President and CEO had, in fact, been a condition of the sale of LVI to CHS as far back as 2005. (A-97; A-33 at ¶ 30; A-95-96; A-100; A-123.) Fried had been actively seeking a successor as President and CEO prior to the equity stake purchase by CHS and, upon the purchase, Simmons, a managing partner of CHS, asked Fried to continue the search. (A-33 at ¶ 30; A-96-97.)

In reliance on this agreement, State entertained the offer from Fried and the Board of Directors to accept the position as President and CEO of LVI. (A-143.) During these employment negotiations, State sought reassurance from the Board,

and ultimately from Fried himself, that Fried intended to retire from his leadership role, especially in light of State's conversations with LVI senior management who inferred that Fried would never retire from his role at LVI.   In an email to Hogan and Simmons dated September 14, 2010, State, as part of his due diligence, sought clarification from the Board as to the provisions for removal of Fried from his position as Chairman of the Board, in the event such a transition would need to be contemplated at a future date.  (A-565-566.)  Several days later, on September 19, 2010, after his conversations with senior team members which appeared to contradict the Board's representations regarding Fried's retirement from day-to-day management responsibilities, State expressed to Hogan his concern with being able to lead LVI with a "single vision," confirming  his understanding that Fried would "retire at some date certain from LVI upon a new CEO being named and offer to support the business under a consulting agreement in any way the new CEO sees fit."  (A-568-569.)   In light of his concern that Fried would "never retire," State asked for a meeting with Fried to clarify their working relationship. (Id.)  Upon hearing of Scott's concerns from Simmons, Fried unambiguously wrote "I will repeat my offer to Scott. I am prepared to remain at LVI until he, the Board or I decide it's time for me to leave. . . an offer he can't refuse . . . ." (A-137.) Reassured by this confirmation, State accepted the position of President and CEO.

After his hire, State was immediately confronted with Fried's intent to continue to play a pivotal role in the management of LVI and with a comprehensive list of responsibilities sent by Fried that he intended to continue to perform.  (A-173-188; A-192-193.)  At a meeting on October 19, 2010, in reference to the laundry list of ongoing responsibilities that State had fully intended to pass on to his senior managers, State purportedly asked Fried the baffled and exasperated question "Burt, you're 71 years of age, how long do you expect to work . . . what if you get hit by a bus, . . . the company has to plan for the future." (A-61-62; A-114-115; A-157-158.)  Fried's dramatic reversal prompted State to seek additional clarification from the Board regarding Fried's retirement plans, including an email to Simmons relating State's comment to Fried that "it was his objective to have him truly retire and be just an on call resource."  (A-575.) Finally, State commented to a friend that he was "[i]n a battle with [Fried] about his need to retire but the Board gets it, and is working to exit him with some respect."  (A-473.)

Rather than evidencing a nefarious plot to discriminate against Fried on the basis of his age, State's pre and post-hire inquiries regarding Fried's retirement constitute nothing more than requests for clarification of how long Fried intended to retain his operational responsibilities at LVI.  As the District Court concluded, citing numerous cases from this Circuit: "courts have consistently held that

38

remarks relating to retirement or transition planning are insufficient to defeat a motion for summary judgment in an ADEA case."  See Boston v. McFadden Pub., Inc., No. 09 Civ. 457(RJH), 2010 WL 3785541, at *11 (S.D.N.Y. Sept. 29, 2010) ("even if plaintiff was asked about his retirement plans, inquiries about retirement plans do [ ] not necessarily show animosity toward age"); Vesprini v. Shaw Contract Flooring Servs., 315 F.3d 37, 42 (1st Cir. 2002) (comment that the time had come for the plaintiff to "step back and let the young stallions run the [day-to-day] business" not sufficient to constitute direct evidence of age-based animus"); Mereish v. Walker, 359 F.3d 330, 336 (4th Cir. 2004) ("ambiguous remarks referring to the process of generational change create no triable issue of age discrimination") (citing cases); Getler v. Cornell Weill Univ. Med. Coll. Dept. of Surgery, No. 05 Civ. 8550, 2007 WL 38276, at *11 (S.D.N.Y. Jan. 3, 2007) ("inquiries about retirement plans do not necessarily show animosity toward age"). This is particularly so where the plaintiff was the first to raise the topic of retirement, as Fried had with his repeated reassurances that he would leave when asked.  See McFadden Pub., Inc., 2010 WL 3785541, at *11; Spahr v. Am. Dental Ctrs., 03 Civ. 4954 (DRH) (ARL), 2006 U.S. Dist. LEXIS 14581, at *12 (E.D.N.Y. Mar. 14, 2006).

Contrary to the assertions of Fried and the EEOC, Raskin v. Wyatt Co., 125 F.3d 55 (2d Cir. 1997) is entirely on point.  In Raskin, the Second Circuit affirmed

the grant of summary judgment to the employer in an age discrimination claim where the primary evidence in support of Raskin's claim was a statement by his supervisor that Raskin might not be interested in a manager position because of his age and a reference to his eligibility for early retirement. Id. at 63. Even under the higher pre-Gross standard, the Second Circuit found that Raskin's supervisor had a legitimate reason to confirm Raskin's interest in a career change in light of his having an option of taking early retirement and that the inquiry, arising in a conversation about Raskin's application for a manager position, failed to support an inference that age played a role in the defendant's decision not to offer Raskin the position. Id. The Court concluded: "The ADEA does not make all discussions of age taboo." Id. Like that of Raskin's supervisor, State's inquiry into Fried's intentions to step down from his active role at LVI, when placed in proper context, was not a statement implying that Fried should retire because of his age, but, rather, a logical question to a person who had previously made numerous statements that he was ready to hand over the reins of management.

The cases cited by Fried and in the Amicus Curiae Brief of the Equal Employment Opportunity Commission (the "EEOC Brief") dealing with retirement related comments are clearly distinguishable from the undisputed facts of this matter. These cases involve discriminatory comments, unlike State's, that evidence preconceptions of the infirmities of old age and that are coupled with

additional indices of discriminatory conduct or situations.  See Giarratano v. Edison Hotel, No. 08 Civ. 1849(SAS), 2009 WL 464441 (S.D.N.Y. Feb. 24, 2009) (in addition to a purportedly ageist comment, the plaintiff set forth evidence that the defendant's legitimate business reason for the adverse action was pretextual); O'Reilly, 435 Fed. Appx. 8, 2011 U.S. Dist. LEXIS 61521 (negative comments regarding infirmities of old age including plaintiff's memory, speech ticks and the shape of his bald head); Sciola v. Quattro Piu, Inc., 361 F. Supp. 2d 61 (E.D.N.Y. 2005) (repeated unprompted references to retirement and comments plus discrepancies in reason for termination, including differing accounts to the plaintiff's performance and lack of documents to justify termination for bad performance); Schreiber v. Worldco LLC, 324 F. Supp. 2d 512 (S.D.N.Y. 2004) (plaintiff alleged multiple statements from numerous management members directly denigrating his age); Hofmann v. Dist. Council 37, No. 99Civ.8636(KMW)(JCF), 2004 WL 1936242 (S.D.N.Y. Aug. 31, 2004) (comments that plaintiff was having "senior moments," was "too old to work" and "too old to learn" in addition to suggestion that he should retire); Morris v. N.Y.C. Dep't. of Sanitation, No. 99 CV 4376(WK), 2003 WL 1739009 (S.D.N.Y. Apr. 2, 2003) (same); Shapiro v. N.Y.C. Dep't. of Educ., 561 F. Supp 2d 413 (S.D.N.Y. 2008) (unprompted comments that the plaintiff should retire, comments that his teaching style was "antiquated" and "outdated," supervisor's references to his

desire to have a staff of "young teachers," statistical evidence of disparate treatment of older teachers and defendant's failure to articulate a legitimate business reasons for the adverse actions); <u>Velasquez v. Gates</u>, No. 08 CV 2215(CLP), 2011 WL 2181625 (E.D.N.Y, June 3, 2011) (summary judgment denied where employee who was terminated for poor performance raised evidence that reason for termination was pretextual where defendant had never been warned or counseled about her performance); <u>Carlton v. Mystic Transp.</u>, 202 F.3d 129 (2d Cir. 2000) (unprompted suggestion of retirement plus conflicting explanations for termination and lack of negative performance warnings); <u>Schreiber</u>, 324 F. Supp. 2d 512 (statements that plaintiff was not asked to join a group because the supervisor did not want older people in the group and that "older people do not have the same energy level as younger persons" and retort to plaintiff's question of "How am I doing?" with "Pretty good except for your age.").[4]

---

[4] The other cases cited in Appellant's Brief relating to "stray comments" in general are equally inapplicable or, in some cases, supportive of Defendants' position. <u>Abdu-Brisson v. Delta Air Lines, Inc.</u>, 239 F.3d 456, 468 (2d Cir. 2001) ("overwhelming" evidence of defendant's interest with age and projected retirement age of pilots); <u>Danzer v. Norden Sys.</u>, 151 F.3d 50 (2d Cir. 1998) (multiple examples of bias including requests for age of the sales force in addition to ageist comments); <u>Henry v. Wyeth Pharms., Inc.</u>, 616 F.3d 134, 150 (2d Cir. 2010) (finding exclusion of evidence of a supervisor's "tar baby" remark and references to "voodoo" in a race discrimination case to be harmless); <u>Tomassi v. Insignia Fin. Group, Inc.</u>, 478 F.3d 111 (2d Cir. 2007) (monthly unprompted comments about retirement and suggestion that she work with seniors since she "got along better" with them); <u>Kirsch v. Fleet Street, Ltd.</u>, 148 F.3d 149, 154 (2d Cir. 1998) (remark about company being interested in "younger vision, new younger blood" and comment to plaintiff of "You better watch your ass.  If you look around, you see all young people"); <u>Gipson v. Wells Fargo N.A.</u>, 460 F. Supp. 2d 15, 27 (D.D.C. 2006) (heavy evidence of pretext including plaintiff's superior qualifications and evidence of highly subjective criteria in failure to promote case); <u>Diaz v. Jiten Hotel Mgmt.</u>, 762 F. Supp. 2d 319, 321 (D. Mass. 2011)

In this case, other than the legitimate inquiries about retirement, Fried has failed to set forth any evidence that would meet his burden of proving that Defendants' reasons for terminating his employment and offering him a consultancy was pretextual and that age was the "but for" reason for these actions. Other than clearly misleading statements in his brief, such as declaring that there is no evidence on the record of Fried's interference, and misstating the law, Fried has failed to prove that the reason for his termination – to ensure that State had an unencumbered opportunity to turn LVI around – masked a discriminatory motive. He has similarly failed to prove, as he must post-Gross, that, if not for his age, he would never have been terminated.  As such, the Court's decision to grant Defendants' motion for summary judgment on the ADEA discrimination claim was entirely proper.

## IV.　THE DISTRICT COURT CORRECTLY HELD THAT THE NEW YORK CITY HUMAN RIGHTS LAW IS INAPPLICABLE TO FRIED'S DISCRIMINATION AND RETALIATION CLAIMS

The District Court correctly held that the NYCHRL is inapplicable to Fried's claims and properly granted LVI's motion for summary judgment with respect to all of his claims brought pursuant to the NYCHRL.

---

(use of highly offensive ageist language, including calling the plaintiff an "old lady," an "old pumpkin" and an "old hankie" and evidence of similar comments to other older employees plus alleged freeze on raises found to be patently false and evidence of management's drafting of false reports to get rid of older worker).

The NYCHRL expressly limits the applicability of its protections to acts that occur within the boundaries of New York City.  See N.Y.C. Admin. Code § 2-201. See also Casper v. Lew Lieberbaum & Co., Inc., No. 97 Civ. 3016(JGK), 1998 WL 150993, at *4 (S.D.N.Y. Mar. 31, 1998).  Indeed, courts in New York have consistently held that, under the NYCHRL, in order to merit protection, the "impact" of an adverse decision on the plaintiff's employment must be in New York City.  See Salvatore v. KLM Dutch Airlines, No. 98 Civ. 2450, 1999 WL 796172, at *16 (S.D.N.Y. Sept. 30, 1999); Casper, 1998 WL 150993, at *4.

Fried's novel argument – that he merits the protection of the NYCHRL because New York City was impacted by his termination – is not only self-aggrandizing, but wholly unsupported.  Even if, in fact, New York City had been financially impacted by Fried's termination, the "impact" requirement of the NYCHRL refers to the impact on the employee, not the impact on the City.  See German v. Cornell Univ., No. 03 Civ. 9766(DAB), 2005 WL 2030355, at *5 (S.D.N.Y. Aug. 17, 2005) (dismissing plaintiff's NYCHRL claim even when decision to pressure him to retire was made in New York City because "plaintiff still only felt the impact of that discrimination in his place of occupation, Long Island, not New York City"); Casper 1998 WL 150993, at *4 (finding the NYCHRL inapplicable to an employee who worked in Garden City, Long Island, even though the defendant had an office in New York City).  Moreover, Fried's

reliance on <u>Hoffman v. Parade Publ'ns</u>, 15 N.Y.3d 285 (2010), is puzzling since the District Court relied on <u>Hoffman</u> in finding the NYCHRL inapplicable to Fried's claims.  In <u>Hoffman</u>, the Court of Appeals rejected plaintiff's claim and held that the NYCHRL protects only those who felt the impact of an adverse decision in New York City – namely those who "work in the city."  <u>Id.</u> at 291.  It is undisputed that Fried neither lived nor worked in New York City, but rather resided and worked in Westport, Connecticut.  The decision to terminate Fried impacted his employment where he worked – Westport, Connecticut.  The "impact" to New York City from the loss of his attendance at meetings there, is entirely irrelevant under the law.[5]

<u>Lightfoot v. Union Carbide Corp.</u>, No. 92 Civ. 6411, 1994 U.S. Dist. LEXIS 6191 (S.D.N.Y. May 12, 1994) is precisely on point.  In <u>Lightfoot</u>, the plaintiff, like Fried, transferred from the defendant's New York City office to its Danbury, Connecticut headquarters.  <u>Id.</u> at *2.  Unlike Fried, Lightfoot continued to reside in New York City after relocating his office to Connecticut.  <u>Id.</u>  Lightfoot brought an age discrimination claim under the NYCHRL contending that, because the defendant had an office in New York City and he occasionally did work from his residence in the City, he should be afforded the protections of the NYCHRL.  <u>Id.</u>,

---

[5] Although Fried categorizes his contacts with New York City to be substantial he admittedly only attended seventeen meetings in the City in the last six months of his employment. (Appellant's Brief at 44-45.)

45

at *17.  The Court concluded that the scope of the NYCHRL did not extend to Connecticut, the place where the plaintiff suffered the impact of the purportedly discriminatory decisions.  Id.  Fried, like Lightfoot, by his own admission, worked predominantly out of LVI's Westport, Connecticut office where he was impacted by the decisions made by Defendants relating to his employment, and, as such, he is outside the protections of the NYCHRL.

As an additional argument, Fried maintains that the District Court's finding "cuts directly against the public policy expressed in the statute." (Appellant's Brief at 47.)  However, the District Court, in reliance on the Court of Appeal's holding in Hoffman, aptly made the following observation: "[the goal of the impact requirement] would be completely undermined if courts were required to conduct a fact-intensive analysis of the amount of contact a particular individual maintained with New York City even where it was undisputed that the individual did not work in New York City . . . [t]his is especially true in today's increased globalized society in which business is often conducted over large distances."  (SPA-36.) Rather than supporting public policy, Fried's reading of the impact requirement of the NYCHRL would make it virtually impossible to draw a clean line between those employees who merit the protections of the NYCHRL and those who do not, thereby undermining the simplicity and predictability the Hoffman decision espoused.  Under New York law, therefore, there is no legal basis to hold that

Fried should be protected under the NYCHRL – a statute that expressly reserves its protections to those individuals who work in New York City.

Because Fried failed to demonstrate that the alleged discriminatory and/or retaliatory conduct had an "impact" on his employment within New York City, he cannot state any claim under the NYCHRL, and this Court should affirm the District Court's dismissal of his claim.

## CONCLUSION

For all the foregoing reasons, the District Court properly granted Defendants' Motion for Summary Judgment.  Defendants respectfully request that the District Court's decision be affirmed and Fried's appeal dismissed.

Dated:          New York, New York
                May 29, 2012

                                    Respectfully submitted,

                                    JACKSON LEWIS LLP


                                    s/ Joanne Seltzer
                                    Joanne Seltzer
                                    Jillian L. Hunt
                                    666 Third Ave., 29th Floor
                                    New York, New York 10017
                                    212-545-4000
                                    joanne.seltzer@jacksonlewis.com
                                    jillian.hunt@jacksonlewis.com

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

1.      This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because the brief contains 11,588 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of  Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in 14 point Times New Roman.


Dated:          New York, New York
                May 29, 2012

                                        Respectfully submitted,

                                        JACKSON LEWIS LLP


                                        s/ Joanne Seltzer
                                        Joanne Seltzer
                                        Jillian L. Hunt
                                        666 Third Ave., 29th Floor
                                        New York, New York 10017
                                        212-545-4000
                                        joanne.seltzer@jacksonlewis.com
                                        jillian.hunt@jacksonlewis.com